IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

WINNEBAGO TRIBE OF NEBRASKA, *et al.*

      Plaintiffs,

vs.

Case No.02-4070-JTM

PHILL KLINE, Attorney General for the State of Kansas, *et al.*,

      Defendants.

MEMORANDUM AND ORDER

      This matter is before the court on the motion for summary judgment of the plaintiffs. Plaintiffs are Indian Tribes and seek a determination that application of the Kansas Motor-Vehicle Fuel Tax Act (KMFTA) to their importation of fuel from Nebraska to Indian Reservations in Kansas is illegal.

      On May 4, 2005, United States Magistrate Judge Karen Humphreys stayed all further proceedings (with the exception of resolution of the present dispositive motion which has been referred to the undersigned) in light of the successful petition for certiorari in *Prairie Band Potawatomi Nation v. Richards*, 379 F. 3d 979 (10th Cir. 2004), cert. granted, 2005 WL 443943 (U.S., Feb. 28, 2005). The magistrate judge directed the parties to submit additional pleadings relating to the motion to the court, and the parties have done so. Defendants argue that a stay of the motion for summary judgment is appropriate because discovery is incomplete and in light of the *Prairie Band* case, and the question of state law raised herein should be certified to the Kansas Supreme Court. Plaintiffs argue that summary judgment should proceed on both issues.

      For the reasons stated herein, the court finds that the issue of state law should be certified to the Kansas Supreme Court, and that the resolution of the federal issue should be stayed.

No stay is justified merely on the grounds that discovery is incomplete. Defendants here merely invoke the lack of the formal completion of discovery; they do not identify any discrete discovery issues which are outstanding which would prevent resolution of the summary judgment motion. Given the long history of the present case, there are no grounds for concluding that the parties were unable to complete any and all factual discovery relevant to the issues raised by the summary judgment motion. Accordingly, the court renders the following findings of fact.

**Findings of Fact**

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment

rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Plaintiff Winnebago Tribe of Nebraska is a federally-recognized American Indian Tribe organized under the Indian Reorganization Act of 1934, 25 U.S.C. § 476, and is the beneficial owner of and exercises jurisdiction over the Winnebago Tribe of Nebraska Indian Reservation. The Winnebago reservation is located in northeast Nebraska, and is not contiguous to Kansas. Ho- Chunk, Inc., and plaintiff HCI Distribution are corporations organized under the laws of the Winnebago Tribe. HCI is wholly-owned by Ho-Chunk Inc., which in turn is wholly-owned by the Winnebago Tribe.

*The Winnebago Indian News*, dated January 18, 2005, indicates that Ho-Chunk, Inc., the parent company of HCI Distribution, had 2003 non-gaming revenues of $80 million and was "featured in Inc. magazine as one of the 500 fastest growing companies in the United States." (Def. Exh. H, at 11).

According to the website maintained by the plaintiff Winnebago Tribe, Ho-Chunk, Inc., is apparently a holding company with the following "business list": HCI Distribution (tobacco and gasoline products); Heritage Express (convenience stores specializing in discount gas and cigarette sales); AllNative.com (Native American e-commerce site); Blue Earth Marketing (marketing, advertising and graphic design); AllNative Office (office products, machines, furniture); Indianz.com (Native American Indian news); AllNative Systems (communications solutions); Dynamic Homes (modular housing manufacturer); HCI Construction (solutions for individual and commercial building); Ho-Chunk Community Development (501(c)3 nonprofit corporation); REZ Cars (used car dealership). The 2001 Annual Report for Ho-Chunk Inc. states that "Ho-Chunk, Inc. was established so that tribal business operations would be free from political influence and outside the bureaucratic process of the government." (Def. Exh. J.)

On May 8, 2001, HCI mailed to the Kansas Department of Revenue both an Application for Motor Vehicle Fuel and Special Fuel Importer/Exporter License and an Application for Motor Vehicle Fuel and Special Fuel Distributor's License. Along with these applications, HCI mailed a Motor Vehicle Fuel and Special Fuel Importer/Exporter Bond in the amount of $5,000.00 and a Motor Vehicle Fuel and Special Fuel Distributor's Bond in the amount of $1,000.00.

3

On May 11, 2001, the Department returned the Application for Motor Vehicle Fuel and Special Fuel Distributor's License and the Motor Vehicle Fuel and Special Fuel Distributor's Bond to HCI by mail.

According to HCI employee Crystal Appleton, when she received the returned application and bond, she called the Department to ask why the documents were returned. The Department representative told her that the Department did not require that HCI obtain a distributor's license, and that the only license that HCI needed was an importer/exporter license. According to the defendant, HCI would not qualify for a distributor's license because they indicated they did not have a place of business in the State of Kansas.

The Department issued to HCI a Motor Fuel Importer/Exporter License with an effective date of May 4, 2001, instead of a distributor's license.

Plaintiff Sac and Fox Nation of Missouri is a federally-recognized American Indian Tribe.

The Sac and Fox Nation wholly owns and operates two retail gas stations – the Trad'n Post in Reserve, Kansas, and the Sac & Fox Truck Stop in Powhattan, Kansas. Both of these tribally-owned businesses are located on land held in trust by the United States for the benefit of the Sac and Fox Nation.

Plaintiff the Iowa Tribe of Kansas and Nebraska is a federally-recognized American Indian Tribe. The Iowa Tribe wholly owns and operates a gas station in Kansas on land held in trust for the Iowa Tribe by the United States of America.

Plaintiff the Kickapoo Tribe of Indians of the Kickapoo Reservation is a federally recognized American Indian Tribe. The facts are disputed as to the location of the Tribe's gas stations. According to plaintiffs, the Kickapoo Tribe owns and operates two gas stations in Kansas located on lands within the exterior boundaries of the reservation pursuant to Treaties executed in 1854. According to defendants, the only gas station of the Kickapoo mentioned in the complaint is a "Truck Plaza" which sits outside the boundaries of the Kickapoo Tribe's reservation.

HCI began selling fuel to the Kansas Tribes in August 2001. The Winnebago Tribe has transported the fuel sold to the Kansas Tribes by tanker trucks from Nebraska to the Kansas Tribes' tribal gas stations.

At no time did the Winnebago Tribe ever purchase or receive the subject fuel in Kansas from any person, and the fuel was not stored and did not come to rest in Kansas before its delivery by the Winnebago Tribe to the Kansas Tribes' facilities. The Winnebago Tribe did not and does not own or lease storage facilities, transfer facilities, mixing facilities, offices or any other facilities within Kansas.

On September 10, 2001, shortly after the Winnebago Tribe started selling motor fuel to the Kansas Tribes, defendant Lochow of the Kansas Department of Revenue sent a letter to the Winnebago Tribe. Lochow stated that HCI, as a licensed importer under the Act, was required to report and remit Kansas fuel taxes on deliveries of fuel to any retailer in Kansas regardless of location.

John Blackhawk, Chairman of the Winnebago Tribe, responded to Lochow's letter on September 18, 2001, writing that the Winnebago Tribe disputed that Kansas had the right under federal law to tax the sales to the Kansas Tribes

On October 17, 2001, Charles Reomer of the Kansas Department of Revenue responded to Blackhawk's letter by once again demanding payment of the fuel tax, and stating that "[u]nder Kansas law, tax is due upon importation of motor fuel by the distributor of first import." (Plf. Exh. K.)

On April 8, 2002, defendant Scott, designee of the Director of Taxation, Kansas Department of Revenue, submitted an Affidavit and Application for Arrest Warrant that led to the seizures of property and other actions that necessitated this lawsuit. The affidavit and application stated that "the distributor, importer or manufacturer on or before the 25th day of each month, shall render to the director at the director's office in Topeka, Kansas a report 'certified to be true and correct showing the number of gallons of motor fuel imported.' See K.S.A. 79-3410." (Plf. Exh. B). In fact, Section 79-3410 of the Act states that the report must show "the number of gallons of motor-vehicle fuels or special fuels received by such distributor, manufacturer, importer, exporter or retailer during the preceding calendar month".

On the following day, April 9, 2002, the defendants seized the following property of HCI: two trucks, two tanker trailers, fuel and fuel oil, two black permit books and shipping papers. The parties dispute whether the seizures occurred with prior notice. On the same date, the Department of Revenue entered orders for jeopardy assessment and issued tax warrants against HCI and the individual plaintiffs.

5

The plaintiffs also allege that the defendants also initiated criminal proceedings against plaintiffs HCI, Chairman Blackhawk and Lance Morgan, but the evidence fails to support the contention, and defendants deny it. The record shows only that criminal proceedings were commenced by the State of Kansas.

According to the defendants, HCI transports the fuel in its own trucks, and the contracts entered into between the Kansas Tribes and HCI appear to be "destination contracts," under which title would not pass until HCI tendered the fuel in Kansas.

Plaintiffs Sac and Fox Nation and Iowa Tribe do not know where the contracts with HCI were entered into. The Kansas Department of Revenue has ruled that the state fuel tax in issue is imposed on a distributor when such fuel is first received in the State of Kansas at its business. Written Final Determination of Kansas Department of Revenue Office of Administrative Appeals, Docket No. 00-911, at 1 (Dec. 10, 2001).

In February, 2002, the Department of Revenue introduced a new fuel tax bill that proposed to replace the "distributor of the first receipt" language with a phrase stating that "the incidence of the tax is imposed when the fuel is received." Exhibit Q, SB 537, § 7 at 14. This same Senate bill proposed to amend the definition of "received" to include language that the fuel is received "in the case of imports, other than by pipeline, upon entry into this state" thereby defining "received" for the first time to encompass nonresident importers. Exhibit Q, § 2 at 4. SB 537 was never enacted into law.

The Internet sites of the Sac and Fox and the Kickapoo Tribes solicit customers to travel to their casinos via state highways.

HCI uses Kansas highways in making its deliveries. HCI imports fuel into Kansas in making deliveries to the Kansas Tribes. HCI must cross the Kansas State line to reach the Kansas Tribes' properties in Kansas, located in Brown County, Kansas. The distance from Emerson, Nebraska, referred to in the plaintiffs' complaint as the site of HCI's blending facility, to Reserve, Kansas (near the Sac and Fox reservation), is approximately 170 miles. The distance from Emerson, Nebraska, to White Cloud, Kansas (near the Iowa reservation), is approximately 176 miles. The Kickapoo reservation is further south, in the southwest part of Brown County.

> KDR's bond application form for importers/exporters has provided for some years:
>
> WHEREAS, The above-named principal is an importer/exporter within the provisions of the motor fuel tax laws of the state of Kansas, and is required by such law to render certain sworn statements and reports and pay certain motor fuel taxes, interest and penalties, all to the Director of Taxation, Kansas Department of Revenue, Topeka, Kansas, and to otherwise comply with the provisions of said laws[.]

(Def. Exh. A).

KDR's "distributors" tax return, form MF-52, used by both distributors and importers, requires reporting of, and taxes, motor fuel "received or imported," and has for years. (Def. Exh. C).

Plaintiff HCI submitted to KDR on or about May 14, 2001, a "Motor Vehicle Fuel and Special Fuel Importer/Exporter Bond" which contained language identical to that in KDR's bond application form. HCI also filed distributor's tax returns with KDR for the months May, June, July, August, September, October, November, December 2001; January, February, 2002, reporting "0" gallons of fuel "received or imported." (Def. Exh. D). HCI's tax returns filed with KDR for September, October, November, December, 2001, and January, February 2002 "falsified the number of gallons of motor fuel actually delivered into Kansas associated with the delivery of motor fuels to the Kickapoo, Iowa Tribe and Sac Fox." (Def. Exhibit L.) HCI ceased filing distributor's tax returns with KDR in March 2002.

HCI's "Application for Motor Vehicle Fuel and Special Fuel Importer/Exporter License" was signed by Lance Morgan, and indicated that statements contained therein were true and correct and that HCI consented to certain service of process provisions. In their answer to defendants' request for admission no. 4, the plaintiffs Winnebago/HCI indicated that "Lance Morgan had no actual authority to waive HCI's sovereign immunity and that in the absence of such authority no valid waiver of HCI's sovereign immunity was ever effected under the rules for effecting such waivers that are set forth in HCI's Articles of Incorporation." (Def. Attach. 12).

Former Secretary of Revenue Stephen Richards provided testimony to the 2002 Senate Taxation Committee regarding Senate Bill 537 concerning why moving the motor fuel tax to the rack was good tax policy. Former Secretary of Revenue Stephen Richards also provided at that time a diagram indicating the state of the KMFTA as concerned importers and distributors, and indicating that the tax is due on the

first import. Shirley Sicilian, former Director, Policy and Research, KDR, gave testimony to the 1998 Kansas legislature regarding Senate Bill 421 that the intent of the bill was to make clear that the tax was on the distributor not the retailer.

In May 1994, the Kansas Legislative Division of Post-Audit ("LPA") conducted a performance audit of KDR's enforcement of the KMFTA and discussed the state of the KMFTA, including that importers pay the motor fuel tax.

According to the evidence supplied by defendants, Importers, as distinguished from distributors, have paid Kansas motor fuel tax on motor fuel imported into Kansas for at least the past 23 years, and KDR is unaware of any information that they did not pay the tax for the 49 years prior to that. Plaintiffs have cited one instance of another importer who has left payment of the tax to its retailer.

**Conclusions of Law**

Plaintiffs have advanced two arguments in support of their motion for summary judgment. First, citing *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 459 (1995) they contended that the state fuel tax cannot be applied to them since this would be seeking to tax an Indian Tribe for a transaction occurring in Indian country. According to this argument, it also does not matter which of the plaintiff Tribes is alleged to be the "distributor of the first receipt," and hence the payor of the tax; since the transactions such as delivery of the fuel occurred inside Indian country, then (the argument goes) the "first receipt" of motor vehicle fuel in Kansas occurs in Indian country, and collection of the tax is barred by *Chickasaw Nation.*

The court finds that the Supreme Court's resolution of the issues raised in *Prairie Band Potawatomi Nation v. Richards* may materially advance the resolution of the federal issues here. Accordingly, until the Supreme Court issues its opinion in that case, the court will stay any resolution of plaintiffs' summary judgment motion beyond the present order.

The plaintiffs also argue that the State of Kansas cannot impose the tax on the Winnebago Tribe because it is not the "distributor of first receipt" within the meaning of the statute.

K.S.A. 79-3408(c), provides:

Unless otherwise specified in K.S.A. 79-3408c, and amendments thereto, the incidence of this tax is imposed on the distributor of the first receipt of the motor fuel and such taxes shall be paid but once. Such tax shall be computed on all motor-vehicle fuels or special fuels received by each distributor, manufacturer or importer in this state and paid in the manner provided for herein[.]

Under Section 79-3401(f), a "distributor" as anyone who:

(1) imports or causes to be imported from any other state or territory of the United States motor-vehicle fuels or special fuels for such person's own use in the state of Kansas, or for sale and delivery therein, after the same shall have come to rest or storage therein, whether or not in the original package, receptacle or container; or
(2) imports or causes to be imported, from a foreign country, motor-vehicle fuels or special fuels for such person's own use in the state of Kansas, or for sale and delivery therein, after the same shall have come to rest or storage, whether or not in the original package, receptacle or container;
(3) purchases or receives motor-vehicle fuels or special fuels in the original package, receptacle or container in the state of Kansas for such person's own use therein, or for sale and delivery therein, from any person who has imported the same from any other state or territory of the United States, or any other nation, in case such motor-vehicle fuels or special fuels have not, prior to such purchase or receipt, come to rest or storage in the state of Kansas; or
(4) received and, in any manner, uses, sells or delivers motor-vehicle fuels or special fuels in the state of Kansas on which the tax provided for in this act has not been previously paid.

Section 79-3401(p) defines "received" to mean:

motor-vehicle fuel that is produced, refined, prepared, distilled, manufactured, blended or compounded at any refinery or other place, in the state of Kansas by any person, or imported into this state from any other state, territory, or foreign country by pipeline or connecting pipeline at a pipeline terminal or pipeline tank farm for storage, shall be deemed to be 'received' by such person thereat when the same shall have been loaded at such refinery, pipeline terminal, pipeline tank farm or other place, into tank cars, tank trucks or other container, or placed in any tank from which any withdrawals are made direct into tank cars, tank trucks or other types of transportation equipment, containers or facilities.

The Winnebago Tribe cannot fall under (1) or (2), since the fuel never comes to rest or storage in Kansas, and cannot fall within (3) or (4), since HCI does not purchase or receive the fuel in Kansas. Plaintiffs stress that HCI's application for importer and distributor license was returned approved only as to being an importer, and that representatives of the state mis-characterizes statutory language to make it appear that tax liability was triggered by "importing" the fuel into Kansas rather than "receiving" it within the state. Plaintiffs also note the unsuccessful efforts of the Department to obtain passage a new fuel tax

9

bill which would have altered the statute to alter tax liability from the "distributor of the first receipt" to a statement that "incidence of the tax is imposed when the fuel is received."

The defendants point out that the critical "distributor of first receipt" language in 79-3408(c) was only added in 1998 (1998 Kan. Sess. L., chapt. 96 § 2(c)), and argue that plaintiff's interpretation would imply that before that date the KMFTA would have the nonsensical result that no taxes would have been imposed on anyone. Rather, according to the legislative history submitted by defendants, this language was added merely to confirm that the tax should be imposed on distributors rather than retailers. Defendants point to the higher bond required of importers as opposed to distributors. KSA 79-3403. And defendants point to KSA 97-3408(a) which provides that the tax is "imposed on the use, sale or delivery of all motor vehicle fuels ... used, sold or delivered in this state for any purpose whatsoever."

The plaintiffs correctly noted that the certification is not appropriate merely where a state law issue is unsettled. *Aid For Women v. Foulston*, 327 F.Supp.2d 1273, 1288 (D.Kan. 2004). However, where as here the matter is subject to alternative interpretations, the issue involves an important matter of state public policy, the court believes that certification is appropriate. Pursuant to K.S.A. 60-3201, the Kansas supreme court may answer questions of law certified to it, when requested by the certifying court, "if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court and the court of appeals of this state."

No controlling precedent on the issue exists, and resolution of the issue may be determinative of the case. Accordingly, this court certifies to the Kansas Supreme Court the following question: "Does the Kansas Motor Vehicle Tax, KSA 79-3401 et seq., impose fuel tax collection or payment responsibility upon non-resident Indian Tribes who import fuel from outside Kansas and deliver the fuel to outlets in Indian Reservations within the State of Kansas?"

The present matter is stayed pending resolution of the certified question or the decision in the *Prairie Band Potawatomi Nation v. Richards*.

IT IS SO ORDERED this 30th day of June, 2005.

s/ J. Thomas Marten<br>
J. THOMAS MARTEN, JUDGE